753 So.2d 995 (2000)
Ronald WHITE and Elizabeth White, Plaintiffs-Appellants,
v.
WAL-MART STORES, INC., # 448 and its Insurer, Claims Management, Inc., Individually and in Solido, Defendants-Appellees.
No. 32,621-CA.
Court of Appeal of Louisiana, Second Circuit.
March 3, 2000.
Rehearing Denied March 30, 2000.
*996 S.P. Davis, Sr., Shreveport, Counsel for Plaintiffs-Appellants.
Barham & Warner by Vicki C. Warner, Shreveport, Counsel for Defendants-Appellees.
Before BROWN, KOSTELKA and DREW, JJ.
DREW, J.
Ronald and Elizabeth White filed suit after Elizabeth was injured by falling merchandise at a Shreveport Wal-Mart. The jury found Wal-Mart 100% at fault and awarded the Whites a total of $15,000 in loss of consortium and past general and special damages. The jury awarded no *997 future general or special damages. As amended, we affirm the judgment.

FACTS
Elizabeth White has been employed as a Nurse's Assistant in the Neonatal Intensive Care Unit ("NICU") at Louisiana State University Medical Center ("LSUMC") since 1976. On the morning of May 13, 1996, 39-year-old Mrs. White went to a Shreveport Wal-Mart to purchase cleaning supplies. While there, she ran into Robyn Murray, a nurse at LSUMC, and the two stopped to talk. As the two conversed, Warren Myles, a Wal-Mart employee, came up behind Mrs. White with a ladder. Myles climbed the ladder in order to remove merchandise from an upper shelf for a customer. A column of 10-12 plastic containers were stacked on this shelf to the ceiling. At some point, Myles knocked down the stack of containers onto Mrs. White, striking her on the right side of her forehead.
What actually fell on Mrs. White remains in dispute between the parties. The Whites contended at trial and in brief that what fell were 32-gallon plastic trash cans. Counsel for appellants apparently had a trash can of this type in court, and which was acknowledged in court by Mrs. White and Murray as the type of can that fell. Counsel for appellants, having neglected to file this can or a photo thereof into evidence, motioned this court to supplement the exhibits with this can or a photo thereof. This court denied the motion.
A Wal-Mart incident report was filed into evidence. Attached to the report is a photo showing 10 plastic containers with rope handles. The accident report was filled out by an assistant manager, who wrote that what fell were "10 All Purpose Tubs/1 lb. apiece." Scott Falcon was the manager of the Wal-Mart. Falcon did not complete the accident report, and he did not remember coming to the accident scene, although he was in the store at the time. Falcon explained that he was familiar with the merchandising layout of the store. According to Falcon, Rubbermaid garbage cans were stored in the house-wares department and garbage cans were never displayed on the top shelf in the paint department. The accident occurred in the hardware-paint department.
Falcon testified that what fell on Mrs. White was not the garbage can identified by Mrs. White and Mrs. Murray, but utility totes. He described these utility totes as "big plastic tubs[s] with rope handles." Based upon his handling them in the past, he estimated that each tote weighed approximately one pound. Falcon related that these totes were displayed stacked inside each other along the top shelf or "high wall riser" in the paint department.
In any event, a stack of 10-12 light plastic totes ("containers") fell on Mrs. White, striking her on the right side of her forehead. Murray watched as the containers struck Mrs. White. Mrs. White described the impact as a "very heavy hit" which caused her to fall back against the shelves. Mrs. White recalled that she felt dizzy and was temporarily blinded, and that she immediately complained of a headache and neck pain. She described the pain in her head and neck as a "hard pressure" which "felt like something warm was going up and down [her] head." Murray testified that Mrs. White began shaking, crying and sweating profusely. After the cans hit Mrs. White's head, Murray closed her eyes and screamed as the containers came towards her. The containers glanced off Murray's stomach. Murray, who was nine months pregnant at the time, was apparently not injured and did not seek medical treatment. The containers remained in a stack on the floor.
A Wal-Mart employee brought Mrs. White a chair and offered her an aspirin and a Coke. According to Murray, she insisted that the store call an ambulance, but a store manager told her that an ambulance was not necessary. Murray testified that Mrs. White was not capable of walking out of the store on her own, and *998 that at first Wal-Mart employees wanted Mrs. White to walk to her car before eventually bringing her a wheelchair. In the parking lot, a Wal-Mart employee lifted Mrs. White out of the wheelchair and into Murray's car. Murray drove Mrs. White to the emergency room at Willis-Knighton Hospital.

Emergency Room
Dr. Charles Black examined Mrs. White in the emergency room. Dr. Black testified that Mrs. White complained of lower neck pain, left shoulder pain and a headache. Performing a physical examination, he found "from history a contusion of [the] forehead," but found no evidence of a contusion. In fact, Dr. Black found no signs of trauma to the head; there was no swelling, bruising, redness, scratches or tenderness to her forehead. No dizziness was noted. Dr. Black found minimal tenderness to the paracervical. Mrs. White had full range of motion in her neck with only some resistance, and with no muscle spasm or pain Dr. Black could elicit. Mrs. White had full range of motion in her left shoulder, with slight tenderness over the left trapezius muscle, but no tenderness over the right trapezius muscle.
X-rays of the C-spine and skull were negative and did not show acute injury, although the X-ray of the C-spine revealed reversal of the normal lordotic curve with associated degenerative changes at C4-C5 through C6-C7. Dr. Black explained that the spine may appear straight on an X-ray due to positioning or neck spasm. Mrs. White did not exhibit any neck spasm. Dr. Black saw no evidence of neurological deficit.
Although he found nothing objective which proved an injury, Dr. Black's diagnosis was contusion of the forehead and mild myofascial strain of the neck. The diagnosis of myofascial strain was based on the tenderness and slight resistance on range of motion. Dr. Black provided Mrs. White with muscle relaxers and instructed her to use an ice pack on the first day, take a muscle relaxer and Tylenol and follow-up with Dr. James May if needed. Dr. Black did not believe that Mrs. White suffered anything more than a very mild injury.
Elizabeth White's husband Ronald met her at the hospital. Mr. White recalled that he noticed a knot and some abrasions on his wife's head. He also remembered his wife complaining about the pain in her head, neck, back and shoulders.

Medical Treatment
When the Whites returned home from the emergency room, Mrs. White got in bed, but she was unable to sleep because of the pain. She had a headache as well as soreness and stiffness in her neck. Pain in her back and shoulders continued. Mrs. White recalled that she had a painful bruise on her forehead. Mrs. White testified that she called Dr. James May's office the day after the accident and was told that she couldn't be seen until the next week and to just go to the emergency room. Dr. May, a family physician, had seen Mrs. White prior to the accident in February, 1996.
The day after the accident, Mrs. White contacted her attorney, who told her to go to Winward Hospital. White was examined at Winward by Dr. Braunett Blue. Dr. Blue did not testify at trial, although records from Winward were entered into evidence. Dr. Blue referred Mrs. White to physical therapy at Winward. According to an Initial Evaluation for physical therapy conducted on May 17, 1996, Mrs. White complained of stiffness, pain in the middle back radiating pain in both shoulders, but predominantly in the right shoulder, and headaches on her left side. She appeared to be extremely stiff. There was extreme tenderness upon palpation of the neck, upper back and both upper trapezii and sternocleidomastoids. There were muscle spasms and much muscle guarding in the neck muscles, rhomboids and both trapezii. Active and passive range of motion of the cervical spine was severely limited due to pain and muscle guarding. *999 Mrs. White's gait was normal but her cadence was slow. Mrs. White received physical therapy at least 18 times between May 17 and July 15, 1996. Mrs. White was discharged from physical therapy on July 24, 1996.
Mrs. White was examined by Dr. James May on July 30, 1996. Mrs. White complained only about right shoulder pain and depression. There were no complaints of neck pain. Range of motion was normal in the right shoulder and neck, but Mrs. White expressed pain on motion of her right shoulder. Dr. May's diagnosis at this time was just a shoulder injury. Dr. May prescribed medication for her depression and anxiety, and he encouraged her to return to work because he thought it may help her depression and movement.
A MRI of Mrs. White's cervical spine taken on August 16, 1996, revealed moderate spondylosis extending from C4-C5 through C6-C7. MRIs of the right shoulder and thoracic spine taken on the same date were unremarkable.
Dr. May next saw Mrs. White on November 25, 1996. Based on the MRI, his diagnosis at this time was cervical spondylosis, or arthritic change in the cervical spine. He arranged physical therapy for six weeks at Tri-State Physical Therapy.
Dr. May saw Mrs. White again on September 18, 1997. She complained at this time about pain in her neck, upper back and radiating down her right arm. Mrs. White told Dr. May that she had reinjured her arm when picking up linens at work. She also told him that her arm hurt the same way it had originally hurt after the accident. Dr. May took this to mean that she had gotten better up until that point. He placed Mrs. White on medication for her anxiety and depression and referred her to physical therapy.
Dr. May next saw Mrs. White on October 24, 1997, due to her complaints of anxiety. He allowed her to continue on an anti-anxiety medicine. Because his primary concern at this time was her anxiety, Dr. May did not check her for neck, shoulder or arm pain, although he would have noted any complaints. Dr. May treated Mrs. White for the final time regarding her injury on January 16, 1998. Mrs. White complained of pain in her shoulder, neck and upper back. Mrs. White told Dr. May that she had again reinjured herself and that the original injury had never healed. She also told him she was depressed due to her pain. Dr. May referred her to neurosurgeon Dr. David Cavanaugh because he felt that there was nothing else he could do for her. Mrs. White returned in August of 1998 on an unrelated matter.
Dr. May agreed that it was more probable than not that the accident aggravated Mrs. White's pre-existing bulging disk or degenerative arthritis. He explained that trauma does not make arthritis worse, but instead, it allows the symptoms to manifest.
The only limitation which Dr. May would place on Mrs. White is no overhead work. He also thought she would have difficulty in her arms when lifting heavy objects. In his opinion, Mrs. White had reached maximum medical improvement. Dr. May eventually referred Mrs. White to a pain clinic. On June 22, 1998, Dr. May wrote a letter to Mrs. White's attorney in which he stated that Mrs. White had a minimum of six months of medically documented pain, which is consistent with a four-percent impairment of the whole body, as set out in the AMA Guide to the Evaluation of Permanent Physical Impairment. Dr. May based this on his impression of Mrs. White when he treated her in January, 1998.
Dr. Blue referred Mrs. White to neurosurgeon Dr. Anil Nanda, who conducted a neurological examination of Mrs. White on September 10, 1996. Mrs. White's neurological exam was normal. Although Mrs. White had no neurological deficits, Dr. Nanda requested a nerve conduction EMG because he felt there was some degenerative disk disease in the cervical spine. The EMG was essentially normal. The MRI *1000 showed a bulging disk at C5-6 and C6-7, but without any symptomalogy he would relate to a bulging disk. There was no evidence of nerve impingement. An X-ray showed very mild degenerative disk disease.
Dr. Nanda saw Mrs. White again in February of 1997, at which time she continued to complain of neck pain and had the same bulging disk. Dr. Nanda considered her injuries to be mild to moderate and did not feel Mrs. White was a candidate for surgery. His recommendation was physical therapy. According to Mrs. White, she had physical therapy at Schumpert for two six-week periods. She testified that the therapy made her pain worse. Dr. Nanda agreed that he depended on the information about pain Mrs. White related to him when assessing Mrs. White's injury.
Dr. Nanda's diagnosis was degenerative cervical spondylosis. Dr. Nanda concluded that it was more probable than not that the falling containers caused an aggravation of Mrs. White's pre-existing degenerative arthritis and bulging disk. He thought that Mrs. White's condition should have resolved within three to six months, or at most a year, after he initially saw her. Dr. Nanda expected Mrs. White to fully recover.
When Dr. Nanda was asked if he would defer to the opinion of other physicians about whether Mrs. White still had pain, he responded:
You know, there is no scientific data for that. I will tell you that most patients, if they have problems past three months, it is unlikely. There is probably less than one or five percent of the patients that have problems past a year. It is very low.
Now, you are right, I'm not in Dr. Majors' position and Dr. Rambach's position, but based on that MRI, I would not see that much problem for that long. It is extremely unlikely, if not rare, to see that.
Now, she may have had a post-traumatic syndrome from this or other kind of thing that could cloud the issue, but from my point of view based on that MRI, and I could be wrong, you know, my word is not total on this, and they are pain experts, and Dr. Rambach and all have seen her too, but it is unlikely to have this. I mean, this is unusual for us to see pain that persists that long....
Neurosurgeon Dr. David Cavanaugh examined Mrs. White on March 12, 1998, on a referral from Dr. May. Mrs. White's chief complaints were neck pain, back pain and pain in her right arm. Mrs. White reported to Dr. Cavanaugh that she had reinjured herself twice. Dr. Cavanaugh performed a neurologic assessment of Mrs. White. Her reflexes, balance and coordination were normal, and there was no evidence of weakness. There was subjective numbness throughout the right side of her neck and right arm. Mrs. White expressed pain during range of motion testing of her neck. Mrs. White told Dr. Cavanaugh that she had decreased strength in her right arm, but his motor exam of the right upper extremity was normal and did not evidence any decreased strength. Reflexes in her triceps and biceps were normal and equal on each side. Other than the MRI, Dr. Cavanaugh could find no objective evidence that Mrs. White could not function with her upper right extremity. Mrs. White's posture and gait appeared normal.
Upon reviewing the MRI scan, Dr. Cavanaugh's diagnosis was "apparent" exacerbation of cervical spondylosis. When asked what he meant by "apparent," Dr. Cavanaugh explained that he had to trust his patient because he had no way to prove whether or not she had the symptoms of which she complained. Dr. Cavanaugh described how cervical spondylosis is degenerative change in the spine over a number of years as disks degenerate or bulge. He agreed with Dr. Nanda that there was no need for surgery, leaving pain management and treating the symptoms as Mrs. *1001 White's only options. Dr. Cavanaugh did not think that Mrs. White had any functional limits from a neurologic standpoint, but was only limited by her complaints of pain.
Dr. Kathleen Majors is a pain management physician associated with Pain Care Consultants. Mrs. White was initially seen by Dr. Major's partners, Dr. Macannuco and Dr. Sholte, on June 9, 1998. A musculoskeletal and general physical examination revealed tenderness along the neck and right shoulder. Mrs. White had limited range of motion in her neck. Their diagnosis was spinal cervical spondylosis and myofascial pain syndrome. Recommendations for pain alleviation included Therabeads, an orthopedic pillow, cervical traction, a stimulator, a cervical epidural steroid injection, an anti-depressant, a topical analgesic, Lortab and a suprascapular nerve block injection.
Mrs. White received a suprascapular nerve block injection on June 29, 1998. Dr. Majors, who first saw Mrs. White in August after this injection, was told by her that the injection had helped but was beginning to wear off. She thought Mrs. White was able to return to work after receiving this injection.
Dr. Majors first examined Mrs. White on November 16, 1998. A musculoskeletal examination revealed much tenderness in her right shoulder. Dr. Majors saw Mrs. White one other time after this, on January 13, 1999. Dr. Majors did not do a physical exam at that time, instead, she only checked how Mrs. White was doing with her medications.
Based on the cervical MRI, Dr. Majors' diagnosis is exacerbation of moderate cervical spondylosis resulting in neck, shoulder and upper extremity pain. She would expect Mrs. White's condition to last her lifetime. She agreed that it is more probable than not that the accident aggravated Mrs. White's pre-existing bulging disk and degenerative arthritis condition. Dr. Majors does not believe Mrs. White can return to her job at LSUMC, even with the injections. She also agreed with the limitations set forth in a Functional Capacity Evaluation. Dr. Majors believes that more medication and a cervical epidural steroid injection will help, although she does not expect it would get Mrs. White back to medium work capacity. Mrs. White has yet to receive a cervical epidural steroid injection. Dr. Majors would also like for Mrs. White to work with their pain counselor.
Dr. Baer Rambach, an orthopedic surgeon, examined Mrs. White on August 20, 1998, in order to provide an orthopedic opinion. Mrs. White's attorney wanted Dr. Rambach to evaluate his client. Mrs. White told Dr. Rambach that she had been hit by cans weighing approximately a total of 300 pounds. She complained about neck pain and problems in her right upper extremity. Dr. Rambach performed an orthopedic examination and x-rayed the cervical spine and right shoulder. The x-rays showed a moderate amount of arthritis in the neck, which he thought had been aggravated by the accident. He found tenderness in the back of her neck, lower back and between the shoulder blades, as well as considerable tenderness in the right shoulder. There was restriction of motion in the neck and lower back. Extremes of motion of the back produced pain. Mrs. White indicated she was in great pain during range of motion of the right shoulder and when Dr. Rambach pressed on her head. She also complained of pain when he conducted the foraminal compression test by pressing an area in the back of the neck containing nerve roots. He did not find any neurological deficit.
Dr. Rambach's diagnosis at the time of examination was muscle and ligament sprains and strains to the neck, upper back and lower back. He thought Mrs. White had sustained a significant blow to her head and spine due to the amount of weight striking her. Dr. Rambach did not prescribe any medicine or recommend any *1002 further treatment, but felt that she needed to continue treatment with Dr. Majors. Dr. Rambach believed that Mrs. White has an aggravation of an arthritic process in her spine that is permanent.
Dr. Rambach agreed that it was more probable than not that the accident aggravated a pre-existing bulging disk or degenerative arthritis condition. He thought it is more likely than not that Mrs. White has reached maximum medical improvement. He believed that it is more probable than not that Mrs. White will no longer be able to do her job, and he assigned Mrs. White a disability rating of 25%.
Dr. Rambach signed a physical capacities checklist on September 9, 1998. He felt Mrs. White is precluded from kneeling, pushing, pulling, squatting or reaching above the shoulder. He felt she can lift or carry up to 10 pounds occasionally. At the time he considered her capable of sedentary, part-time work. Dr. Rambach did not use the AMA Guide to the Evaluation of Permanent Physical Impairment, preferring to rely instead on his own experience.
Mrs. White did not tell Dr. Rambach about any of her reinjuries. He also did not know that she was working at the time of trial. Dr. Rambach does not feel that Mrs. White can do her job even if her pain is controlled because her job functions would cause her to aggravate her injury.

Vocational Rehabilitation Counselors
Leonora Maatouck is a vocational rehabilitation counselor who evaluated Mrs. White. Maatouck classified Mrs. White's job at LSUMC as semi-skilled medium work, which is defined as a job requiring occasional lifting and carrying of up to 50 pounds and frequent lifting and carrying of up to 25 pounds. Based on Mrs. White's condition, her job as she described it and how the job is generally described in the Dictionary of Occupational Titles, Maatouck did not think that Mrs. White would be able to perform her job as a nurse assistant. She pointed to the fact that Mrs. White has reinjured herself twice as evidence of this.
Maatouck concluded that there are essentially no jobs which Mrs. White is able to do. She reached this conclusion because Mrs. White did not graduate from high school and is limited by the Functional Capacity Evaluation to sedentary jobs which do not require frequent or constant use of the hands. Maatouck also referred to the physical capacities checklist prepared by Dr. Rambach when reaching this conclusion.
Diana Herbst is also a vocational rehabilitation counselor. She interviewed Mrs. White on October 12, 1998. According to a functional capacity evaluation issued by the Work Readiness Center, it is recommended that Mrs. White not lift more than 10 pounds and do only intermittent reaching, carrying and grasping below shoulder level. The evaluation also apparently states that Mrs. White can use her dominant left hand for overhead reaching. Mrs. Herbst recommended that Mrs. White continue in her job and request accommodations or modifications as needed.

TRIAL AND JUDGMENT
Trial in this matter was held in January, 1999. The jury returned a verdict in favor of the Whites, finding Wal-Mart 100% at fault and awarding Elizabeth White $10,000 in past medical expenses, $3,000 in past lost wages and $1,000 for past pain and suffering, mental anguish and loss of quality and enjoyment of life. Ronald White was awarded $1,000 for loss of consortium. The jury denied Mrs. White recovery for future general or special damages. The trial court denied the Whites' motion for judgment notwithstanding the verdict.

DISCUSSION
The Whites complain on appeal that the jury erred in awarding Elizabeth only $14,000 in damages and in awarding Ronald only $1,000 in damages. The Whites *1003 further complain that the trial court erred in denying their motion for judgment notwithstanding the verdict on the issue of damages.
Mrs. White contended that she never had problems with her neck, back or right shoulder prior to the accident. Mr. White testified that his wife never complained about any back, neck or shoulder problems, or suffered from anxiety or depression prior to the accident. Mrs. White argued that she experiences constant pain and has not been pain-free since the date of the accident. Mr. White testified that his wife has complained of pain in her neck, back and right shoulder since the date of the accident.
Mrs. White alleged that she was never aware prior to the accident that she had a bulging disk or degenerative arthritic condition. She had a good home life and enjoyed washing cars, gardening and cleaning, which she alleged she can no longer do. She did not have problems with depression or anxiety. She and her husband would often do things together.
Mrs. White testified that she missed work for around three and a half months after the accident because pain in her neck, shoulder and upper back prevented her from doing her job. During this time she received physical therapy at Winward. Mrs. White also testified that while she has had problems with her right arm since the accident, her left arm occasionally causes problems. According to Mrs. White, she went to the Schumpert First Care Center in March of 1998 with complaints of pain in her neck, arm and legs.
Mrs. White alleged that before the accident she never had any problems or complaints of pain when performing her job duties. She asserted that she now has to have her co-workers assist her with some tasks by doing the heavier work. She claimed she has continued to work because she needs to keep her insurance. Mrs. White testified that she is no longer able to work double shifts. Working three to four days per week after the accident, Mrs. White normally worked eight-hour shifts, but on weekends worked twelve-hour shifts in order to have more days off. Mrs. White testified that she has reinjured herself twice at work, once when dumping linen, the other time when she was trying to remove a carton of formula from a shelf. These incidents occurred in September of 1997 and January of 1998. Mrs. White apparently went to the emergency room after the September, 1997 reinjury. Mrs. White has never asked LSUMC to make any accommodations because she was afraid of the consequences.
A court of appeal may not set aside a jury's factual finding unless that finding is manifestly erroneous or clearly wrong. Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). When factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The trier of fact has much discretion when assessing damages in cases of offenses, quasi offenses and quasi contracts. La. C.C. art. 2324.1. Before an appellate court may disturb an award for general damages, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to prior awards in similar cases is proper; if an award is abusively low, it is raised to the lowest *1004 amount the trier of fact could reasonably have awarded. Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for determining whether an award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact; likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Manuel v. State Farm Mut. Auto. Co., 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
Regarding the standard of review for special damages, this court has stated:
The discretion afforded the trier of fact to assess special damages is narrower or more limited than the discretion to assess general damages. Some special damages, such as medical and related expenses, cost to repair or replace damaged property, loss of wages, etc., are easily measured.... An award for past lost earnings, which are susceptible of mathematical calculation from documentary proof is not subject to the much discretion rule.
Eddy v. Litton, 586 So.2d 670 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1203 (La. 1992).

Past Lost Wages
The jury awarded Mrs. White $3,000 in past lost wages. Kathy Reed, Human Resources Manager at LSUMC testified that Mrs. White missed a total of 248 hours, 480.2 hours and 73 hours between the date of the accident and the date of trial. Filed into evidence is Mrs. White's sick leave record from July 1, 1996 through March 25, 1998. The total number of hours on this report is 553.2 (480.2 + 73), therefore we assume the figure of 248 mentioned by Reed represents the number of hours Mrs. White missed from the date of the accident until July 1, 1996, the first date on this report.
It is apparent that the jury awarded Mrs. White past lost wages only until July 30, 1996. Between July 1, 1996 and up to and including July 29, 1996, Mrs. White missed 20 days, or 160 hours. Adding the 160 hours to the earlier figure of 248 hours equals 408 hours. At the time of her injury, Mrs. White earned $7.37 per hour. Multiplying this wage times 408 hours equals $3,006.96. Although the jury miscalculated the lost wages by less than seven dollars, it is clear that the jury intended to compensate Mrs. White only for lost wages through July 29, 1996.
In making this award, the jury obviously found that Mrs. White's injury had resolved to such an extent that she was no longer precluded from performing her job at LSUMC. This finding by the jury that Mrs. White was able to return to work by July 30, 1996, is supported by the record. We note that the same plastic containers struck a pregnant Mrs. Murray in the stomach after hitting Mrs. White, but yet Murray did not testify that she sought medical treatment. We also note that when Mrs. White went to the emergency room, Dr. Black did not find any objective signs of injury to her head.
Mrs. White was discharged from physical therapy at Winward on July 24, 1996. The discharge summary reports, "Patient states that she can abolish symptoms with proper posture and chin tuck exercises." Our emphasis. This summary states that there were no obvious deviations to Mrs. White's gait. Her stride, cadence and arm-swing were normal and bilaterally symmetrical. The report also states, that "[p]alpation of cervical and upper thoracic paraspinals reveals no indication of muscle spasm or muscle guarding." During range-of-motion tests of the cervical spine, "slight" pain was reported only during right and left lateral sidebending. The assessment section of the discharge summary states:
Signs and symptoms are consistent with myoligamentous sprain of C3-T6. Patient tolerated Physical Therapy treatment *1005 well. Symptoms have not completely abolished at time of discharge but patient should continue to progress toward total resolution with independent home exercise program and attention to proper sitting postures.
Dr. May examined Mrs. White on July 30, 1996. While Mrs. White complained about depression and pain in her right shoulder, there was no report of neck pain. She had normal range of motion in the neck and right shoulder, but complained of pain in the right shoulder during motion. Dr. May's diagnosis at this time was a shoulder injury. Dr. May encouraged Mrs. White to return to work at this time because he thought it would help her.
The jury did not err in awarding $3,000 in past lost wages. Nonetheless, we amend the award to $3006.96 to correct the obvious miscalculation by the jury.

Past Medical Expenses
The jury awarded $10,000 in past medical expenses. The Whites argue they are entitled to an award of $13,333.33.
A plaintiff's recovery of medical charges must be confined to those expenses related to the accident. Phiratsamy v. Pipes, 27,209 (La.App.2d Cir.8/23/95), 660 So.2d 172. A tortfeasor is required to pay for the cost of overtreatment or unnecessary medical treatment unless the overtreatment was incurred by the victim in bad faith. Sumrall v. Sumrall, 612 So.2d 1010 (La.App. 2d Cir.1993); Starnes v. Caddo Parish School Bd., 598 So.2d 472 (La.App. 2d Cir.1992). There is no evidence in this record that Mrs. White incurred any treatment in bad faith.
Mrs. White incurred the following costs for medical treatment: (i) $912 from Pain Care Consultants; (ii) $167 from Dr. Cavanaugh; (iii) $4,976.28 for MRIs taken at Willis Knighton and ER services; (iv) $3,452 for physical therapy, office visits, injections, and X-rays at Winward; (v) $340 from Dr. May; (vi) $931.38 for prescriptions; (vii) $267 from MediQuip; (viii) $117 from Dr. Don Holton; and (ix) $1,353 from Schumpert. Mrs. White was billed $770 by Dr. Rambach for providing an orthopedic opinion per her attorney's request. Her evaluation by Dr. Rambach was not for purposes of medical treatment; therefore, this cost is not considered to be a past medical expense.
Mrs. White is entitled to an award of $12,515.66 for past medical expenses. The judgment shall be amended to reflect this amount.

Past General Damages
The bulging disk and degenerative arthritis were not caused by the accident, therefore, it is irrelevant for purposes of discussing this issue that the August 1996 MRI of the cervical spine evidenced these conditions. The accident simply made these conditions symptomatic.
Mrs. White only complained about shoulder pain when she was examined by Dr. May in July of 1996. The July 1996 Winward discharge summary acknowledged that while the symptoms had not been completely abolished at the time, Mrs. White was expected to progress to total resolution. Dr. Nanda testified that he thought the injury could have been completely resolved within three months after he examined her in September, 1996. Dr. Black did not even believe that Mrs. White had suffered an aggravation of her pre-existing disk and arthritic conditions. Arguing that he would have seen trauma to Mrs. White's head had she received the full force of the containers on her head, Dr. Black reasoned that Mrs. White was not struck significantly such that it would have caused aggravation of a pre-existing degenerative condition.
Viewing the evidence in the light most favorable to the defendant, Mrs. White's injury would have been completely resolved no earlier than July 30, 1996, the cut-off date used by the jury in awarding lost wages. It was an abuse of the jury's discretion to award only $1,000 in general damages for the aggravation of a preexisting *1006 spinal condition which lasted roughly 11 weeks.
Mrs. White was clearly in pain during these 11 weeks. She was unable to work and endured at least 18 physical therapy sessions during this period. Her upper body was extremely tender. She had muscle spasms and her range of motion in her cervical spine was limited.
Examining the jurisprudence, we conclude that the lowest amount the jury could have reasonably awarded is $15,000. Compare Lennard v. State Farm. Mut. Auto. Ins. Co., 26,396 (La.App.2d Cir.1/25/95), 649 So.2d 1114, where the trial judge granted additur to increase the general damages award to $15,000 for a 40-year-old female who bumped her head in a car accident and suffered aggravation of an asymptomatic pre-existing bulging disk in her neck. Lennard missed no work, but had trouble lifting heavy mail bags at her post office job. She underwent physical therapy for two months and medical treatment for 18 months. Her intermittent neck pain lasted up to three days at times, and the pain made sleep difficult two to four times per month.
We amend the judgment to increase the award of general damages to $15,000.

Loss of Consortium
The jury awarded Mr. White $1,000 in loss of consortium. Our review of this record does not reveal an abuse of the jury's discretion in making this award.

Future General and Special Damages
In denying recovery for any future damages, the jury concluded that Mrs. White's injuries were completely resolved at the time of trial. In addition to the testimony previously cited, we note Dr. Nanda's testimony that he expected Mrs. White to fully recover. There is ample support in the record for the jury's finding on this issue. The jury did not err in refusing to award any future general or special damages.

CONCLUSION
We amend the judgment to increase the award of past lost wages to $3,006.96, to increase the award of past medical expenses to $12,515.66, and to increase the award of past pain and suffering, mental anguish and loss of enjoyment and quality of life to $15,000.00.

DECREE
As amended, at appellees' cost, the judgment is AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, STEWART, KOSTELKA, and DREW, JJ.
Rehearing denied.
WILLIAMS and STEWART, JJ., would grant rehearing.