794 So.2d 97 (2001)
Donna J. DOSS, et al., Plaintiffs-appellees,
v.
SECOND CHANCE BODY ARMOR, INC., et al., Defendants-appellants.
No. 34,788-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 2001.
*99 Usry & Weeks by T. Allen Usry, John F. Weeks, II, Fred Schroeder, New Orleans, Counsel for Appellants.
A. Scott Killen, James M. Wilkerson, Farmerville, Counsel for Appellees.
Before NORRIS, CARAWAY and KOSTELKA, JJ.
CARAWAY, J.
In this tort action where defendants concede liability, the appeal concerns the trial court's awards for past and future economic damages to plaintiffs chicken farming business due to his injured condition and inability to efficiently manage his farm. Finding an abuse of discretion in the trial court's award, we now amend the trial court's judgment.

Facts
This suit arises from the accidental shooting of Lieutenant Tommy C. Doss ("Doss"), a Ruston police officer, by a fellow law enforcement officer, Union Parish Deputy Curtis Batten, that occurred during a drug interdiction operation in Ruston conducted by a joint task force. Deputy Batten does not contest his fault on appeal, nor does his employer, Sheriff Robert G. Buckley, contest that he is liable under the doctrine of respondeat superior.
The accident occurred on June 24, 1994 when Deputy Batten lost his balance exiting an automobile and accidently discharged his service pistol. The bullet traveled through the front seat of the car and struck Doss to the left of the spine in his lower back. Doss was wearing body armor at the time of the shooting, so the bullet did not penetrate his body.[1] Although the vest kept the bullet from penetrating Doss's back, it did not diminish the blunt trauma Doss received from the force of the bullet. Doss was taken to Lincoln General Hospital's emergency room, where he was examined, treated, and released the same day. He returned to his job with the Ruston Police Department the following Monday.
Doss visited several physicians over the five and one-half years before trial and went to physical therapy on a few occasions. Ultimately, an MRI showed that Doss has a mild bulging disc near the point of the bullet's impact. Overall, Dr. Thomas L. Morris ("Dr. Morris") testified at trial that Doss's injury and subsequent pain stems from an injury to his left paraspinus muscle. Dr. Morris stated that he noticed some asymmetry, in that the left paraspinus muscle is larger and more firm than the right muscle, and that in the future, the muscle could become weak and lose its flexibility, or atrophy. Doss also complains of neck pain and headaches, and Dr. Morris testified that an injury to the paraspinus muscle can cause neck pain and headaches, since the muscle is large and runs from the lower back up to the neck area.
Doss described his pain as occurring "off and on," and stated that some activities, such as certain tedious work on his farm, aggravate his injury. However, in order *100 to try to remain in good physical health, Doss plays racquetball for a half hour or so, four to five times per week. Doss did not testify as to whether his pain increased after playing racquetball.
Between the shooting and the date of trial, Doss received cortisone injections in the paraspinus muscle to help with the pain, as well as prescriptions for anti-inflammatory drugs. He stated that the cortisone injections gave him the most relief from the pain, but that ultimately, he continues to suffer with back and neck pain, as well as headaches.
Also, during this time frame, Doss continued working as a full-time police officer, as well as continuing his work with his chicken farming operation. Doss's chicken farm consists of six chicken houses, each of which can hold approximately 20,000 chickens. Having missed only a day and one-half from work as a police officer, Doss sought recovery of his economic losses for the decline in his chicken farming business. This appeal, which no longer includes the issue of general damages,[2] concerns the economic impact to Doss's farm.
In its reasons for judgment, the trial court stated that Doss suffered "severe and debilitating injuries" as a result of the enormous "force of the blast which slammed his head into the steering wheel." The trial court also concluded that the gunshot wound caused permanent damage to Doss's left paraspinus muscle. More specifically, the trial court summarized Doss's condition by quoting, in part, a letter dated January 31, 2000, from one of Doss's treating physicians, Dr. Richard I. Ballard:
His pain has been very consistent in the thoracolumbar junction area and would go along with the blunt trauma which he sustained. He has had spasm, trigger points and decreased motion in his back and on review of his previous clinic chart, there is no previous history of any back complaints whatsoever. Although there was no evidence of any bony injury, I would liken the soft tissue injury to his back to that of being hit with a board or a bat in the mid to low back. This man's problem is definitely related to his activity. The more farm work which he does, the more pain he has in his back. The more he lifts and twists, the more frequent are his recurrences.
He has continued to take anti-inflammatory medication, muscle relaxant (sic) on an intermittent basis and has continued to have to have trigger point injections intermittently.
In his chicken operation, Doss raises young chickens provided to him by ConAgra. ConAgra also supplies the chicken feed at its cost. Doss is compensated by ConAgra when he delivers the flock back to ConAgra at full growth and his production results are ranked against the results from other ConAgra producers. Doss was in the poultry business approximately two years before his injury.
Doss called upon Dr. Robert Shelor ("Dr. Shelor"), an associate professor of Finance at Louisiana Tech University, to testify about the past and future economic damages from the decline in his poultry farming business. Dr. Shelor presented his opinion of Doss's past and future lost opportunities using what he termed as a "standard of excellence" analysis. Dr. *101 Shelor claimed that he established the "standard of excellence" analysis based on Doss's testimony that before his accident, he consistently ranked first and second among his competitors, thus receiving the highest pay from ConAgra.
In the trial court's reasons for judgment, it ruled that Doss was entitled to $366,961.16 for past economic loss for the 5-½-year period before trial. Apparently, the trial court averaged Dr. Shelor's figures for producer ranks one and two to arrive at the $366,961.16 figure. For future economic loss, the trial court refused to follow Dr. Shelor's trends and projections analysis, and rendered judgment in the amount of $260,000, based on Doss's testimony that he recently hired a new farm worker for $200 per week ($200 × 52 weeks × 25 years = $260,000). Appellants' appeal primarily seeks the review of the propriety of the trial court's awards for the alleged losses to Doss's poultry business. Appellants also challenge whether Doss's residual pain was the cause-in-fact of any economic loss, past or future, to his poultry operation. Plaintiffs answered the appeal seeking an increase in the award for future economic losses, claiming that the trial court misapplied the law regarding future lost income and earning capacity.

Legal Authority
A court of appeal may not set aside a judge or jury's factual finding unless that finding is manifestly erroneous or clearly wrong. Stobart v. State Through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); White v. Wal-Mart Stores, Inc., 32,621 (La.App.2d Cir.3/3/00), 753 So.2d 995, 1003, writ denied, XXXX-XXXX (La.6/23/00), 765 So.2d 1041. When factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989); White, supra.
The trial court has much discretion in the assessment of damages in tort cases. La. C.C. art. 2324.1; Gladney v. Sneed, 32,107 (La.App.2d Cir.8/18/99), 742 So.2d 642, writ denied, 1999-2930 (La.1/14/00), 753 So.2d 215. An appellate court may disturb a damage award only when the record clearly reveals that the trial court abused its discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Gladney, supra.
Damages for profits cannot be based on speculation, and must be proven within a reasonable certainty. Louisiana Farms v. Louisiana Dept. of Wildlife and Fisheries, 95-845, (La.App.3d Cir.10/9/96), 685 So.2d 1086, 1105-1106, writs denied, 97-0486, 97-0507 (La.4/4/97), 692 So.2d 420, 422. Awards for lost future income are inherently speculative, and courts must exercise sound discretion to render awards which are consistent with the record and do not work a hardship on either party. Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537, 541 (La.App. 2d Cir. 1987); Morgan v. Willis-Knighton Medical Center, 456 So.2d 650 (La.App. 2d Cir.1984). Purely conjectural or uncertain future lost earnings will not be allowed. Young v. Louisiana Medical Mutual Ins. Co., 98-522 (La.App. 5th Cir.12/16/98), 725 So.2d 539, 544.
Factors listed in our decisions awarding damages for loss of earnings are *102 physical condition before and after an accident, life expectancy, work life expectancy, discount and inflation rates, and past work record. Rodgers v. National Dealer Services, Inc., 508 So.2d 1007 (La.App. 2d Cir.), writs denied, 512 So.2d 1183 (La. 1987) and 513 So.2d 1211 (La.1987); Eppinette v. City of Monroe, 29,366 (La.App.2d Cir.6/20/97), 698 So.2d 658; Robbins v. State ex. rel. Dept. of Labor, 31,590 (La. App.2d Cir.2/24/99), 728 So.2d 991. The testimony of an economist is entitled to weight, but since it is necessarily based on uncertain future events, it is not conclusive. Cutchall v. Great American Pump Co., 460 So.2d 1106 (La.App. 2d Cir.1984).

Discussion
The evidence concerning Doss's farming operation was provided at trial primarily by Doss himself and Wayne Stewart, an employee of ConAgra, the supplier of chickens for Doss's farm. Additionally, Doss's broiler settlement statements (hereinafter "the Statements") received from ConAgra from mid-1994 through 1999 were introduced at trial. In defense, appellants introduced Doss's income tax returns which reported increases in Doss's farm income from 1993-1998.[3]
The testimony revealed that throughout a producer's growing cycle, there is an extensive process of maintaining the birds and the chicken houses. The cycle includes installing and adjusting the feed and water lines, maintaining the various equipment for the regulation of temperature in the houses, culling defective chicks, and cleaning the houses and equipment between cycles. With six houses each stocked with up to 20,000 chicks and the uncertainties of weather and equipment failure, Doss's physical work is constant. Failure to stay on top of the necessary adjustments would lead to the inefficient use of feed, which would ultimately increase ConAgra's cost in the birds, and thereby lower the producer's ranking.
The testimony showed that the manual labor requirements which Doss performed exacerbated his back and neck pain. The pain he experienced affected his overall management of the houses. Doss testified that he continued to employ only one laborer at a pay rate of $4,420 per year, plus room and board, as he had done prior to the accident. During the 5-½ years between his accident and trial, he occasionally employed part-time laborers. Immediately prior to trial, Doss employed an additional worker for $200 a week plus lodging. Stewart testified that most other ConAgra producers work full-time in their operations, while Doss is only able to work on his farm after his full-time duties as a police officer. From our review of the record and the rulings of the trial court, quoted herein, we find no manifest error in the trial court's conclusion that Doss's injury and continuous pain, which is exacerbated by the manual labor associated with his farm, caused him to suffer economic losses in the 5-½ years prior to trial and would continue to cause him future losses.
Regarding the quantum issue, the ConAgra Statements summarize Doss's record for each production cycle and compare and rank Doss's production data with other producers who delivered chickens to ConAgra at the same time.[4] ConAgra provided *103 the young chickens and the feed to each producer at its cost and then ranked the producers based upon the level of efficiency each achieved over the growing cycle. ConAgra's pay rate per pound decreased from the highest ranked producer to the lowest. In his testimony, Stewart did not review the details of the Statements, nor did he explain precisely how the comparative data[5] listed for the producers served to determine ConAgra's scale of prices paid to the producers for each cycle. From our review of the Statements which listed the information of all producers in a cycle, ConAgra's cost per pound sold was the primary factor which determined the order of ranking.
Although no ConAgra settlement statements for the cycles before Doss's injury were introduced at trial, Stewart and Doss testified that Doss was usually ranked as the Number 1 or 2 producer during the preceding 24 months in which Doss had been in business.[6] The number of other producers with whom Doss was ranked varied significantly from cycle to cycle. There were as few as four to as many as eleven other unidentified producers whose data was listed on some of the Statements. Nevertheless, Dr. Shelor reported that Doss's ranking for the cycles after the accident averaged 5.57 out of the 8.2 average number of producers throughout the 5-½ year period between his accident and trial. Dr. Shelor also testified that while ConAgra's price paid to the top producer for each cycle averaged 049704 cents per pound and steadily increased, Doss's pay rate declined and averaged only .038878 cents per pound.
From the Statements, Dr. Shelor prepared various estimates of Doss's past economic loss for the 5-½ years since the accident. Using the average pay rates received by ConAgra's top two producers for each cycle and Doss's actual pounds sold, Dr. Shelor determined that Doss would have received an additional $127,246 (as a No. 2 producer) to $166,241 (as a No. 1 producer) in revenue from ConAgra. When the loss was further adjusted using the maximum pounds of production Doss sold during a cycle in the 5-½ years,[7] the amount lost ranged from $235,341 to $279,281. Finally, using a rate of return of 12.321% applied to each cycle's loss over the past 5-½ years, Dr. Shelor's maximum range of Doss's "opportunity value of diminished revenue" for the 5-½ year period was from $335,496.71 to *104 $398,425.62. Using these maximum estimates, based upon the top two producer prices, Doss's maximum production sold in a cycle, and the 12.321% rate of return, the trial court averaged the above two estimates and awarded $366,961.16 for past economic loss.
Using the same data for the top two producer prices, Doss's maximum capacity, and the statistical trend identified from the past 5-½ years, Dr. Shelor projected the future economic loss to Doss's chicken business for the next twenty-five years. Depending upon whether Doss might raise the larger or smaller chickens and the various manners of employment of the other factors discussed above, Dr. Shelor estimated the future economic loss at levels from $924,670 to $1,399,652.
The trial court's reaction to Dr. Shelor's future economic projections, although based upon the same statistical theory used to compensate Doss's pre-trial losses, was altogether different from its earlier award of $366,961.16 for Doss's past losses. Rejecting Dr. Shelor's projections, the trial court instead ruled as follows:
The Court has carefully reviewed the conclusions and the bases therefor of the plaintiffs' imminent expert witness, Dr. Roger Shelor. Dr. Shelor testified that his opportunity costs analysis is based on the best possible alternative. But he admitted that he had no information about the sustained ability of a farm to be at maximum capacity or ranked number one....
Mr. Wayne Stewart testified that as recent as October of 1999 one of the Doss chicken houses was actually number one and another was number two. He candidly stated that there has been a lot more competition among the chicken farmers in this area. He further elaborated that fluctuations occur among these farmers in their rankings.
The Court is of the opinion that there is no way to predict whether the Doss farm could and/or would consistently sustain a high ranking among their competitors because of the numerous factors involved. Accordingly, the Court must reject the approach of Dr. Roger Shelor and his "best case scenario" projections as to future economic losses.
However, events after an accident that affect a plaintiff's quality of life can be and should be taken into account in determining future damages. Mr. Doss may expect to have intermittent pain and suffering the rest of his life. This condition has and will affect his ability to engage in certain strenuous manual labors on his chicken farm. Approximately seven to eight weeks prior to the trial of this case, Mr. Doss hired an additional laborer to help him on his farm. This action was necessitated by his physical limitations. The Court finds that his farm's efficiency should improve with the addition of this new hired help. There is evidence to suggest that Mr. Doss could engage in the chicken farming business for twenty-five more years from the time of trial. The more recent employee is compensated at the rate of Two Hundred Dollars ($200.00) per week and a place to stay. Clearly, Mr. Doss is entitled to recover for these future services in the amount of Two Hundred Sixty Thousand and No/100 ($260,000.00) Dollars calculated as follows: $200 per week × 52 weeks per year × 25 years. This figure would be a conservative estimate since there are no adjustments for inflation.
When we compare the two rulings of the trial court concerning the past and future farming losses, we first observe that the trial court used Dr. Shelor's statistical analysis and compensated Doss for the losses over the past 5-½ years on the *105 average of $66,720 per year ($366,961 ÷ 5-½). On the other hand, rejecting the projected statistical trend, the trial court determined Doss's future compensation by supplementing the farm's additional manual labor needs at the rate of $200 per week or $10,400 per year. Since both analyses are significantly flawed, we find that the trial court erred in its determination of both awards.
One error in the trial court's award of $366,961.16 for past economic losses is the portion of Dr. Shelor's estimate which increased each cycle's loss with a 12.321% rate of return. The legal remedy for the time value of money pertaining to damages in a tort action is legal interest from the date of judicial demand. La. R.S. 13:4203; Sharbono v. Steve Lang & Sons Loggers, 97-0110 (La.7/1/97), 696 So.2d 1382. Therefore, most of the past cycle losses to which Dr. Shelor opined occurred after the date of filing of the suit, so that any investment opportunity loss is generously accommodated by the applicable rate of legal interest accruing on the total award from the date of judicial demand.
Next, while Dr. Shelor's use of the data from the Statements was statistically sound, the Statements themselves did not report sufficient information to satisfy us that the other unidentified and higher ranked producers were on an equal footing with Doss in terms of their farm operations. In other words, Dr. Shelor's specialized knowledge and expert opinion were intended "to assist the trier of fact to understand the evidence" under La. C.E. art. 702. Nevertheless, that evidence, which was produced by plaintiff in the form of testimony from Doss and Stewart and the ConAgra ranking system as revealed by the Statements, was insufficient to support the assumption that Doss was performing on a relatively equal playing field with the other producers.
The Statements ranked different groupings of ConAgra farmers from cycle to cycle primarily on the basis of ConAgra's cost for each pound of poultry produced. Doss and Stewart gave testimony indicating that by poor maintenance of the feeding system or by insufficient culling of the sick or injured chicks, the producer's expenditure of the feed supplied by ConAgra would be high and his pay rate low. Thus, for example, while Doss's May 30, 1995 settlement statement revealed that his chickens'"livability" rate and his average weight per bird were higher than both the overall producer average and the rate and average weight of the Number 1 producer, Doss was ranked fourth out of five, because his cost per pound of poultry was the fourth highest. Furthermore, Stewart testified that the majority of Doss's competitors did not attempt to hold a second full-time job like Doss and that the level of competition increased. The Statements listing production volumes indicate that Doss's six-house farm may have been much larger than most of the other farms.
Missing from the ConAgra Statements, which focused on ConAgra's cost per pound, is the variable cost of labor which each producer expended during a cycle in raising the harvested birds. We know that Doss's labor force, consisting primarily of himself with help from his wife and one permanent laborer, did not change except for the fact that Doss became more inefficient when he worked in pain. We do not know, except in very general terms, who the other producers were, nor do we know the total number of competitors. Likewise, the Statements and other evidence reveal nothing regarding the other producers' ongoing expenditures on labor, nor the condition of their houses and equipment compared to Doss's. Thus, while the Statements show that the top producers received greater revenue from *106 ConAgra because of their efficiency with ConAgra's chickens and feed, they do not reveal that the top producers' actual profits and profit margins, considering all of their labor and capital costs, were superior to Doss's. Doss's federal income tax returns reveal that his net farm profits, before depreciation, show a significant gain from 1993, the year before the accident, through 1995, the first full year following the accident. See footnote 3, supra.
Doss did testify that he ranked as a top producer in the 24 months before the accident. Yet, the group of unidentified and undocumented (see footnote 2) producers before the accident was never clearly established by the evidence to have remained constant or even closely similar to the many other groupings of producers against which Doss competed in the 5-½ years thereafter. Even if the producers' identities did not significantly change due to business failure or change of ownership, the number of producers appears to have increased, and their capital improvements and employment of labor could have varied considerably when compared to Doss's farm. Accordingly, the trial court's conclusion that "there is no way to predict whether the Doss farm could and/or would consistently sustain a high ranking among their competitors because of the numerous factors" applies equally to the measure of the past and future economic losses before and after the trial. We likewise agree with the trial court's conclusion that the cost of additional labor was a better indicator of the economic loss Doss suffered and apply it to the prior 5-½ years, thus lowering the trial court's award of $366,961.16 for past economic loss in Doss's poultry business to the maximum which the trial court could determine, $100,000 plus legal interest from date of judicial demand.
The trial court's ruling envisioned a lump sum award which would compensate for the monthly cost of additional future labor for twenty-five years following the February 2000 trial. The trial court stated that it did not discount the lump sum award, because it considered that the rate of inflation applicable to the future wage stream would in fact make the lump sum payment a conservative award. This view, however, overlooks the immediate investment rate of return that can be earned on a lump sum payment. That rate of return, which Dr. Shelor generously estimated at 12.321%, will exceed the rate of inflation applicable to the future stream of wage payments used as the measure of damages, requiring us to discount the lump sum award.
Additionally, the court was mandated under La. R.S. 13:4203 to award prejudgment legal interest from date of judicial demand on the $260,000 lump sum award, even though Doss would only begin experiencing those losses in February 2000, some four-and-one-half years after judicial demand. This problem presented by the mandate of La. R.S. 13:4203's prejudgment legal interest has been discussed in the jurisprudence as a statutory problem pertaining to future economic damage awards which only the legislature may address. Sharkey v. Sterling Drug, Inc., 600 So.2d 701 (La.App. 1st Cir.), writ denied, 605 So.2d 1099, 1100 (La.1992). Nevertheless, similar to the discount analysis discussed above for the lump sum award for future losses, a further discount to the award can be applied to adjust the award for the considerable legal interest which will be applied for the time when the loss had not yet arisen.[8]
*107 Finally, the trial court awarded Doss future economic damages for a period extending 25 years from the date of trial, when Doss would be over 70 years old. We find this award unrealistic. See, Rodgers v. National Dealer Services, Inc., supra. While the court could determine the loss based upon Doss's need for additional manual labor, that need would likely occur at some point in time as Doss grew older. Additionally, conclusions regarding how to conduct the business of chicken farming over such an extended period of time are too speculative to support the court's analysis. Accordingly, finding an abuse of the trial court's discretion, we lower the award for future economic loss to the maximum which the trial court could award under these circumstances, $180,000 with legal interest from date of judicial demand.

Conclusion
For the reasons stated above, the judgment of the trial court awarding damages to plaintiff for past economic loss is hereby amended to $100,000 and the judgment awarding future economic loss is amended to $180,000. Legal interest on both amended awards shall run from date of judicial demand. As amended, the judgment is otherwise affirmed. Costs of this appeal are to be shared equally by the parties.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] The manufacturer of the body armor, Second Chance Body Armor, Inc., was originally named a defendant, but was voluntarily dismissed by plaintiffs.
[2] In their brief to this Court, appellants originally questioned the amount of general damages awarded to Doss as being excessive; however, during oral arguments, counsel for appellants stated that after reviewing Doss's appellate brief, they believe that the general damages awarded Doss were within the trial court's discretion. Thus, we consider appellants' assignment of error on this issue as abandoned.
[3] Doss's net farm profits before depreciation were as follows: 1993 = $25,583; 1994 = $24,990; 1995 = $40,311; 1996 = $48,722; 1997 = $41,515; and 1998 = $47,202.
[4] The ConAgra Statements that Doss introduced omitted data for two cycles in 1994 in which Doss raised chickens. There were no statements for the cycles before the accident, and some of the Statements only listed Doss's ranking without listing the price, cost and quantity for the other producers ranked with Doss in those cycles.
[5] The Statements reported columns of data for the producers listed as follows: Age; Head Sold; Pounds Sold; Pay Rate; 7-Day Mort; % Liv.; Avg. WGT.; MKT. Conv; Gr. Cost Per LB.; Deviation From Avg.; Pay Per Bird; % Condem.
[6] Doss began operating the farm during his father's illness in the late 1980s. Doss assumed full operation after his father's death and, in 1992, built three additional houses, bringing the farm's total operation to 6 chicken houses.
[7] The pounds of chicken delivered to ConAgra varied during the 5-½ years, because at times Doss was required to raise a smaller bird in 42 days, and at other times he raised a larger bird in 56 days. The maximum weight Doss produced in a cycle for the small bird was 492,598 pounds. This occurred for a cycle in which Doss received 127,800 birds from ConAgra. The amount of chicks delivered for the small bird cycles ranged significantly from approximately 96,500 to 130,000. The average weight of production for the small birds was 436,192 pounds. The maximum weight of production for a cycle for the larger bird was 370,014 pounds and the average was 320,564 pounds. The amount of chicks delivered for the large bird cycle was approximately 108,000. Dr. Shelor used the maximum weights for each bird cycle to readjust all cycles over the 5-½ years to maximum capacity.
[8] The purpose of legal interest is to compensate for "damages due to the delay in the performance of an obligation to pay money." Former La. C.C. art. 1935 (1870) and La. C.C. art. 2000. Unlike other tort damages which are generally extant at the time of judicial demand, future economic damages are not but are instead calculated to begin from the date of trial. Thus, the appropriate question for the determination of the trial court award for future economic loss in such circumstances is: What sum of money with legal interest from June 22, 1995 (the date of judicial demand) would be necessary to compensate Doss as of February 2000 for the economic losses beginning in February 2000 at the rate of $200 per week?