CARAWAY, J.
11With liability for the accident stipulated, a jury awarded $100,000 in future special damages for injuries arising out of a pedestrian/automobile accident involving a five-year-old boy. The jury failed to award past special damages, which had been stipulated, or past or future general damages. The jury further found that the insurer defendant was not in bad faith in its refusal to tender approximate amounts for the loss under La. R.S. 22:1892. The trial judge thereafter granted plaintiffs motion for judgment not withstanding the verdict and increased the award to $600,000. The trial court also ruled that no penalties under La. R.S. 22:1892 were owed. Both parties now appeal. For the following reasons, we affirm the trial court’s JNOV ruling.

Facts

On October 30, 2002, five-year-old T.M.G. was crossing Highway 167 in Winn Parish to board a school bus when he was struck and injured by a vehicle driven by a minor. The school bus was headed north on the road and had stopped and activated its warning signals. The minor driver was traveling south at approximately 45 m.p.h. and failed to heed the warnings. The force of the impact caused T.M.G. to be thrown an estimated distance of 65 feet. T.M.G. was unconscious at the scene. Because of his injuries, T.M.G. remained in the hospital for two weeks. T.M.G. sustained a broken left femur, damage to the spleen, and severe lacerations to the face and neck. He was released from the hospital in a body cast, and for the next laseveral months, T.M.G. was reliant first on a wheelchair and subsequently on crutches for mobility.
On October 23, 2003, the child’s guardian, individually, and on behalf of T.M.G., filed a petition for damages. Later, on February 19, 2004, the child’s mother (hereinafter “plaintiff’), was appointed natural tutrix of the child and was authorized to retain counsel to prosecute this case on behalf of the minor child, T.M.G. She was substituted as the plaintiff in this matter.
In addition to seeking damages, plaintiff also sought penalties and attorneys fees for insurer bad faith under La. R.S. 22:1892.[1] The petition named as defendants the minor driver; her father, Monty D. Carpenter; Louisiana Farm Bureau Casualty Insurance Company, in its capacity as the insurer of the Carpenters; and Winn Parish School Board (WPSB) and its underinsured/uninsured motorist (UM) carrier, Coregis Insurance Company (Co-regis). The Carpenters’ insurer, Louisiana Farm Bureau, tendered the policy limits of $25,000, and the Carpenters were released from the suit.
By the time of the last amended petition, dated January 12, 2006, Coregis remains as the sole defendant. Following the rendition of this court’s opinion in McFarland v. Southern Farm Bureau Cas. Ins. Co., 39,612 (La.App.2d Cir.5/11/05), 902 So.2d 1207, writ denied, 05-1564 (La.1/9/06), 918 So.2d 1045, it was determined that Core-gis’s UM coverage for the accident amounted to $1,000,000.
| :iOn March 26, 2007, the matter was tried by a jury. The trial was limited to the issue of damages and the question of the penalties claimed against Coi’egis. The 7-day trial consisted of witness testimony presented by both parties regarding the existence and extent of T.M.G.’s injuries. Also introduced at trial was testimony regarding the sufficiency of various in *659 surance payments tendered to T.M.G. by Coregis and the other insurer, and the propriety of those payments regarding whether Coregis acted arbitrarily and capriciously in its refusal to tender more than $190,000.
With respect to the insurer bad faith claim, the jury found that Coregis had not acted arbitrarily, capriciously or without probable cause in its failure to unconditionally tender more than $190,000. In addition to this finding, the jury awarded $100,000 in future special damages. The jury awarded no past special damages, no general damages, and no loss of earning capacity.
The verdict form was returned by the jury with the following answers regarding damages:
1. What total amount of money do nine of twelve of you find that plaintiff has proven, more probably than not, would fairly compensate IT.M.GJ for the damages resulting from the motor vehicle accident on October 30, 2002? (The total amount must be without any credit for any sums previously paid or tendered)
$100,000
2. Please specify below how nine of twelve of you arrived at the total sum of money listed in Question No. 1: (the total in Question No. 2 must match the total in Question No. 1)
A. Past Special Damages $ -0-
(medical and related expenses, counseling, therapy, tutoring/educational related expenses, vocational rehabilitation)
|.|B. Future Special Damages $100,000 (medical and related expenses, counseling, therapy, tutoring/educational related expenses, vocational rehabilitation and job training/coaching, mileage/transportation expenses)
C. Past General Damages $ -0-
(physical pain and suffering, mental anguish/emotional distress and disability, loss of enjoyment of life, disability and impairment, scarring and disfigurement)
D. Future General Damages $ -0-
(physical pain and suffering, mental anguish/emotional distress and disability, loss of enjoyment of life, disability and impairment, scarring and disfigurement)
E. Loss of Earning Capacity $ -0-
TOTAL $100,000
(The total must match the total in Question No. 1 and must be without any credit for any sums previously paid or tendered)
With this $100,000 award, the jury form then instructed the jury as follows:
If the total amount listed in Question No. 1 does not exceed (is less than) $195,000, then go no further. Sign the verdict form and notify the bailiff.
Despite this directive, the jury nevertheless continued in addressing the questions concerning the assessment of penalties against Coregis.
During its deliberations, the jury submitted two questions to the court asking for clarification. The jury first propounded the following question:
Can we, the jury, state what we want the future special damages go to: such as tutoring, counseling, job coaching, job placement, et cetera and delete others?
The trial judge responded in the negative, additionally stating that any expenses would have to have court approval. The second question posed by |sthe jury was whether the $195,000,[2] already received by plaintiff, needed to be placed on the first line of the verdict form? The judge answered by instructing the jury to add A, B, C, D, and E under interrogatory number two and place that total at the bottom of that column.
Following the jury's verdict, both parties filed motions for judgment notwithstanding the verdict (JNOV), and plaintiff additionally, and in the alternative, sought a new trial. Coregis’s motion asked the trial court for a determination that the verdict, as evidenced by the verdict form, awarded plaintiff $100,000 in addition to the amounts previously tendered. Coregis also asked that this award be subject to a $25,000 credit under a self-insured reten *660 tion (SIR) provision of its policy, which would have required WPSB to pay the first $25,000. Coregis’s motion was denied.
Plaintiffs motion prayed for the dismissal of the jury verdict for failure to award sums for past medical costs, general damages, for past and future pain and suffering, and loss of earnings. Additionally, plaintiff sought penalties and attorneys fees, denied by the jury, under La. R.S. 22:1892 for Coregis’s failure to make adequate and timely tenders of UM benefits. The trial court granted plaintiffs JNOV and nullified the jury’s verdict. The court awarded $100,000 in past special damages; $100,000 in future special damages; $150,000 in past general damages; $100,000 in future general damages; and $150,000 in loss of earning capacity.[3] Thus, | (¡the court awarded a total of $600,000, a net total increase of $500,000 from the jury’s original award. Without explanation, the trial court also ruled that Coregis was not in bad faith in its handling of plaintiffs claim under La. R.S. 22:1892. The judgment was signed on November 13, 2008. This judgment gave Coregis credit for all sums paid to date and further taxed all costs to Coregis. Both parties now appeal.
I.

Judgment Notwithstanding the Verdict

Coregis argues that the trial coui’t erred in the granting of plaintiffs motion for judgment notwithstanding the verdict (JNOV), which increased the jury’s award by $500,000. Plaintiff asserts that the trial court correctly granted the motion for JNOV, but thereafter abused its discretion in awarding insufficient damages, specifically in the categories of general damages and loss of earning capacity.
Under La. C.C.P. art. 1811, a JNOV is appropriate when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that the court finds that reasonable people could not arrive at a contrary verdict. If there is evidence opposed to the motion for JNOV of such quality and weight that reasonable and fair-minded people, in the exercise of impartial judgment, might reach different conclusions, the motion should be denied. Anderson v. New Orleans Pub. Serv., Inc., 583 So.2d 829 (La.1991); Scott v. Hosp. Serv. Dist. No. 1 of Parish of St. Charles, 496 So.2d 270 (La.1986).
|7In considering a motion for JNOV, the trial court should not evaluate the credibility of witnesses, nor substitute its own reasonable inferences of fact for the jury’s as long as reasonable inferences can be made to support the jury’s verdict. All reasonable inferences or factual questions should be resolved in favor of the non-moving party. Anderson, supra; Brantley v. General Motors Corp., 573 So.2d 1288 (La.App. 2d Cir.1991), writ denied, 577 So.2d 17 (La.1991).
JNOV is a procedurally correct device for raising or lowei’ing an unreasonable damage award. La. C.C.P. art. 1811; Lilly v. Allstate Ins. Co., 577 So.2d 80 (La.App. 1st Cir.1990), writ denied, 578 So.2d 914 (La.1991). When a trial court has determined that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusive *661 ly high or abusively low, it must determine what is the proper amount of damages to be awarded. In making this determination, the trial court is not constrained as are the appellate courts to raising (or lowering) the award to the lowest (or highest) point reasonably within the discretion afforded that court. Rather, the trial court should render a de novo award of damages based on its independent assessment of damages. Anderson, supra.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criterion just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not|sarrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Anderson, supra.
The jury’s verdict in this case awarded only special damages and no general damages. This situation was the subject of the Louisiana Supreme Court’s ruling in Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70, 76, where the court observed that “as a general proposition,” such jury verdict is “illogical or inconsistent.” This is because a plaintiff that experiences that need for medical services, thus incurring “special damages,” can also be expected to have incurred pain and suffering, requiring an award for general damages. Nevertheless, Wainwright set the standard of review of such verdict as follows, because of the possibility for exceptions to the general rule:
However, as demonstrated by the Coleman [Coleman v. U.S. Fire Ins. Co., 571 So.2d 213 (La.App. 3d Cir.1990)] and Olivier [Olivier v. Sears Roebuck & Co., 499 So.2d 1058 (La.App. 3d Cir.1986)] cases, a jury, in the exercise of its discretion as factfinder, can reasonably reach the conclusion that a plaintiff has proven his entitlement to recovery of certain medical costs, yet failed to prove that he endured compensable pain and suffering as a result of defendant’s fault. It may often be the case that such a verdict may not withstand review under the abuse of discretion standard. However, it would be inconsistent with the great deference afforded the factfinder by this court and our jurisprudence to state that, as a matter of law, such a verdict must always be erroneous. Rather, a reviewing court faced with a verdict such as the one before us must ask whether the jury’s determination that plaintiff is entitled to certain medical expenses but not to general damages is so inconsistent as to constitute an abuse of discretion. Only after the reviewing court determines that the fact-finder has abused [8its much discretion can that court conduct a de novo review of the record.

Id.

In this case, the general rule clearly applies as the jury’s verdict which failed to award general damages is illogical and inconsistent, representing an abuse of discretion. T.M.G.’s pain and suffering after being struck by Carpenter’s vehicle is undisputed. Additionally, the jury’s award for special medical damages only purported to address the future medical expenses, ignoring the past special medical damages which were stipulated by the parties.
The jury was obviously confused in filling out the verdict form without consideration of the previously tendered insurance *662 payments as instructed by the form. In such case, neither the trial court nor a court of appeal can speculate regarding what the flawed jury verdict might mean. Accordingly, we reject Coregis’s argument that the jury awarded no general damages because it mistakenly understood those damages to have been previously compensated by the prior insurance payments. The trial coui-t was therefore correct in granting the JNOV, overruling the jury’s verdict, and conducting a de novo review of the record for the determination of damages and the issue of penalties.
II.

Trial Court’s Atuard of Damages

Having determined that the trial judge properly granted the JNOV as to damages, in this case, we now turn to a review of the damages award of the JNOV by the trial judge. The appellate court reviews the trial court’s |inaward of damages pursuant to the JNOV using the manifest error standard of review, regarding the factual matters pertaining to the damages. Davis v. Wal-Mart Stores, Inc., 00-445 (La.11/28/00), 774 So.2d 84. With regard to the pain and suffering and general damages awarded by the trial court pursuant to the JNOV, the Louisiana Supreme Court’s standard in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) applies, as follows:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck [Reck v. Stevens, 373 So.2d 498 (La.1979)] to the present case is that the discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Id. at 1261.
Both Coregis and plaintiff assert that the trial court abused its discretion in its award of damages. Coregis argues the award to be excessively high, and plaintiff excessively low, particularly as the award relates to T.M.G.’s brain injury and loss of earning capacity.
Plaintiffs case in chief consisted primarily of expert opinion relating to T.M.G.’s injuries, highlighting in particular the lingering impact of a purported brain injury stemming from the accident. T.M.G.’s other injuries included a broken left femur, damage to the spleen, and severe lacerations to |uthe face and neck. On the day of the accident, Larry Neikirk, an EMT and first responder, found T.M.G. unconscious on the shoulder of the highway. He testified that he had not expected him to survive the accident. T.M.G. was taken to Louisiana State University Health Science Center (LSU) where he underwent multiple surgeries. T.M.G’s broken left femur was surgically corrected by the implantation of metal screws, along with a metal rod, into T.M.G.’s leg. An exploratory laparotomy indicated a splenic laceration which resulted in a procedure to *663 repair the spleen. Embedded headlight glass was surgically removed from his face and neck.[4] After two weeks in the hospital, T.M.G. was released in a body cast and for the next several months he was reliant first on a wheelchair and subsequently on crutches for mobility. By the time of trial, T.M.G. was no longer suffering from the pain from those injuries. From our review of the multiple injuries suffered by T.M.G., the trial court’s award for past general damages in the amount of $150,000 for these injuries is not unreasonable and is affirmed.
Nothing on T.M.G.’s discharge report from LSU required follow-up neurological testing. Yet, the primary dispute in this case concerns T.M.G.’s brain injury. Specifically, the subcategories of the trial court’s damage awards concerned the future treatment, economic loss and ongoing suffering related to the brain injury. These awards totaled $350,000.
Plaintiff presented the testimony of a pediatric neurologist, Dr. Pena-Miches, and a neuroradiologist, Dr. Mardjona Hardjasudarma. Six months after the accident an MRI showed a diffuse axonal injury, which was |12scattered throughout all areas of the brain. When such an injury occurs, axons responsible for transmitting communications throughout the different regions of the brain are severed. Nevertheless, despite the injury, Dr. Pena-Miches testified that T.M.G. had exhibited no physical impairment regarding his speech or motor functions. Dr. Pena-Miches expressed concerns regarding the effect of the injury to the frontal lobe, suggesting that such injury may predispose a child to hyperactivity, leading to chronic social and academic problems. In his opinion, T.M.G. remains at risk for cognitive behavioral and social disabilities.
Dr. Robert Davis, a neuropsychologist, testified that as a result of the axonal damage, T.M.G. now suffers from disinhi-bition and inattention resulting in attention deficit disorder (ADD). Dr. E.H. Baker, T.M.G.’s treating psychologist, further testified that because of this brain injury, T.M.G.’s brain is not capable of adequately performing higher-order thinking and learning. Without clearly demonstrating his prior IQ, both Dr. Davis and Dr. Baker further testified that the impact of T.M.G.’s brain injury resulted in a drop in his IQ from an average score before the accident to a “low average” score after the accident.
T.M.G.’s mother also averred that T.M.G.’s personality, character, educational achievements and family interaction all drastically changed after the accident. She additionally testified that a residual scar on T.M.G.’s face made him the center of classmate ridicule, as they tormented him by calling him “scar-face.”
11sJoAnna Collins, T.M.G.’s kindergarten teacher for the 2002/2003 academic school year, testified at trial to the dramatic social and academic changes exhibited by T.M.G. Before the accident, T.M.G. was an average kindergarten student, requiring no extra attention. Socially, he played well and constantly interacted with other children. Academically, he was at an expected learning and skill level. Ms. Collins testified that after the accident, T.M.G. was truly a different child. She volunteered to home school T.M.G. in November and December of 2002. Her first impression of T.M.G. was that he had the mental state of a toddler. The usually talkative child was now very quiet and had *664 trouble with his speech. He could no longer remember how to perform the basic task of holding his pencil. By the time T.M.G. returned in January of 2003, he was performing on a preschool level, substantially behind the rest of Ms. Collins’s class. Although it was her intention to fail T.M.G., he was promoted to the first grade after multiple members of the school faculty met and decided it would be more detrimental to hold T.M.G. behind.
T.M.G.’s low performance continued and he was forced to repeat his first grade year. After two years in the first grade, he was promoted to the second grade, where he continued to have difficulties paying attention and following directions. Although he technically received failing grades in the second grade, he was once again promoted to the third grade at faculty discretion.
At the time of trial, T.M.G. was in the third grade. T.M.G.’s third grade teacher testified that T.M.G. was currently ranked in the middle of the |14class. She was confident that he would pass to the fourth grade. T.M.G.’s significant improvements have come after participation in multiple scholastic improvement opportunities, including Sylvan Learning Institute and DIBELS (Dynamic Indicators of Basic Early Literacy Skills). T.M.G. began tutoring at Sylvan in February of 2006, when he was in his second semester of the second grade. At Sylvan, T.M.G. receives specialized educational support through one on one tutoring. In his DIBELS’ class, T.M.G. receives special attention in a small group setting with the goal of improving his reading fluency and enhancing his comprehension. T.M.G. is now performing at the top of his DIBELS’ group.
The defense expert, Dr. Megan Ciota, a neuropsychologist, admitted that the diffuse axonal injury revealed on the MRI indicated a moderately severe injury to the brain. Nonetheless, she emphasized the brain’s “redundant nature,” referring to the idea that multiple cells exist in the brain capable of performing the same function. The scattered and small areas of cell damage were not observable in the later CT scan of T.M.G.’s brain. Dr. Ciota emphasized the consistently normal measures of the brain’s electrical activity revealed in multiple EEG tests. While acknowledging that T.M.G.’s ADD and behavioral problems before the accident were not significant, Dr. Ciota pointed to T.M.G.’s premature birth and associated complications, his family history of ADD, and the family disturbance caused by the change of custody from T.M.G’s guardian to his mother after the accident as other causes that could contribute to the ADD.
11ñThere was general agreement by the experts concerning T.M.G’s need for behavioral counseling, private tutoring, occupational therapy and medication. Also, there was no suggestion that T.M.G. should be restricted by his brain injury regarding activities or challenges presented to him in the future. Finally, Dr. Pena-Miches admitted that “in children, it’s very, very difficult to really obtain a true view of their cognitive abilities.” Therefore, all disabling consequences from the brain injury were not yet measurable at the time of trial given T.M.G.’s age.
Regarding future economic loss, plaintiff presented the testimony of Bob Gisclair, a licensed rehabilitation counselor and certified life care planner. He opined that because of the brain injury, T.M.G. lost access to 50% to 60% of the job market.[5] Gisclair’s calculations were based on *665 a work life expectancy of 30 to 40 years. He utilized limitations outlined in reports by the neuropsychologists and psychologists to determine which occupations T.M.G. would no longer have access to. Gisclair testified that ordinarily, an individual with a significant head injury can expect a loss of access of 80% to 90% of the job market, whereas an individual with a moderate head injury can expect loss of somewhere around 50%.
Gisclair presented a customized “life care plan,” which enumerated future, expectant costs based upon expert reports, medical records, and interviews with T.M.G. and his family. Gisclair’s life care plan, after being discounted to the present value by plaintiffs expert economist, to-talecl 11fi$814,416. This figure was based on a 66-year life expectancy and accounted for projected educational tutoring, counseling, job coaching and job placement services, medical care, and transportation costs. The defense was not made aware of Gisclair’s life care plan until 10 days before the start of trial and argued that the life care plan was patently excessive, particularly considering the $118,000 that was requested for transportation expenses and the $176,000 for counseling for the “next 25 years.” Defense challenged these expenses as arbitrary and unnecessary.
Barney Hegwood, a vocational rehabilitation counselor retained by the defense to review Gisclair’s methodologies, was called on cross by the plaintiff. His initial report to Coregis was that his findings were similar to those of Gisclair. Nevertheless, he testified that this was an atypical case. The scientific methodologies customarily utilized, such as a transferable skills analysis, are inoperable in the case of a nine-year-old who has no work history. Heg-wood also noted that all people do not have access to a certain percentage of the total job market. One of the most important considerations regarding a child’s vocational future includes the work history of both maternal and paternal lines. Hegwood testified that although the approach is speculative, “crystal balling really ... it’s the best thing that we have,” when a child with this measure of brain injury is involved. Hegwood ultimately concluded that T.M.G.’s injury would affect his vocation and his exposure to the labor market; however, he believes T.M.G. has lost access to only 20% of the job market.
| |7The standard of review for the $350,000 damage award for T.M.G.’s future difficulties associated with his brain injury must take into account some objective measures presented to the trial court relating to future medical, counseling, vocational expenses, and earnings. At the same time, discretion is afforded the fact finder under Youn, supra, for assessment of the future general damages to be expected from the emotional suffering and mental difficulties related to the injury. Regarding the alleged loss of future earning capacity and wages, the Louisiana Supreme Court has recognized that “what the plaintiff earned before and after the injury does not constitute the measure” of the loss. Hobgood v. Aucoin, 574 So.2d 344 (La.1990). Damages should be estimated on the injured person’s ability to earn money, rather than what he actually earned before the injury. Id.
Nevertheless, awards for lost future income are inherently speculative, and courts must exercise sound discretion to render awards which are consistent with the record and do not work a hardship on either party. Doss v. Second Chance Body Armor, Inc., 34,788 (La.App.2d Cir.8/22/01), 794 So.2d 97. Purely specula *666 tive or uncertain future lost earnings will not be allowed. Id.
From our review of the record concerning T.M.G.’s brain injury, we find the trial court’s general damage award of $100,000 for the future emotional and mental difficulties arising from the injury was well within the trial court’s discretion under the Youn standard. Regarding the additional $250,000 award for future economic loss and training and medical expenses, we find that such award is more than adequate to afford this 118young child the special counseling, tutoring, and vocational training to become a productive member of society with medical attention to his mental health. A reasonable view of the evidence is that with such training and counseling, the inherently speculative issue of T.M.G’s earnings loss after his education is minimized. Accordingly, the trial court’s award of $250,000 for all such future expenses and economic loss will not be disturbed, and the appellate arguments of both sides to the contrary are without merit.
III.

Insurer Bad Faith

Plaintiff claims the trial court erred in finding that Coregis did not act arbitrarily, capriciously, and without probable cause in failing to unconditionally tender more than $190,000[6] in payment of the damages. Plaintiff argues that continual demands for tenders were made before trial, along with multiple proofs of claims, with which Core-gis did not comply.
Under Louisiana law, an insurer owes a duty of good faith and fair dealing to its insured. As such, an insurer has an affirmative duty to adjust claims fairly and promptly and to make reasonable efforts to settle claims with the insured.[7] La. R.S. 22:1892,[8] provides, inter alia:
A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:1811, 1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of [ many claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest. The insurer shall notify the insurance producer of record of all such payments for property damage claims made in accordance with this Paragraph.
* * *
B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial pay *667 ment or tender has been made, fifty-percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.
La. R.S. 22:1892 is penal in nature, and as such, must be strictly and narrowly construed. Hart v. Allstate Ins. Co., 437 So.2d 823 (La.1983). In order to assess penalties and attorney fees, it must be clearly shown that the insurer was in fact arbitrary, capricious, and without probable cause in refusing to pay. Spivey v. Super Valu, 575 So.2d 876 (La.App. 2d Cir.1991); Gipson v. Yosemite Ins. Co., 494 So.2d 1290 (La.App. 2d Cir.1986); McClain v. General Agents Ins. Co. of Amer., Inc., 438 So.2d 599 (La.App. 2d Cir.1983), unit denied, 442 So.2d 458 (La.1983).
The statutory penalties are inappropriate when there is a reasonable and legitimate question as to the extent and causation of a claim; bad faith should not be inferred from an insurer’s failure to pay within the statutory |2fttime limits when such reasonable doubts exist. Block v. St. Paul Fire & Marine Ins. Co., 32, 306 (La.App.2d Cir.9/22/99), 742 So.2d 746.
Whether or not refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its action. Reed v. State Farm Mut. Auto. Ins. Co., 03-0107 (La.10/21/03), 857 So.2d 1012; Scott v. Insurance Co. of North America, 485 So.2d 50 (La.1986). Because the question is essentially a factual issue, the trial court’s finding should not be disturbed on appeal absent manifest error. Id; Smith v. Audubon Ins. Co., 95-2057 (La.9/5/96), 679 So.2d 372; Fontana v. Louisiana Sheriffs’ Automobile Risk Program, 96-2752 (La.App. 1st Cir.6/20/97), 697 So.2d 1037.
La. R.S. 22:1892 has been held to apply to uninsured or underinsured motorist’s claims. Hart, supra. To prevail under La. R.S. 22:1892 B(l), the claimant must establish that the insurer received satisfactory proof of loss and that failure to timely tender a reasonable amount was arbitrary and capricious. Block, supra. Satisfactory proof of loss within the meaning of the statute is that which is sufficient to fully apprise the insurer of the insured’s claim. Hart, supra; McDill v. Utica Mut. Ins. Co., 475 So.2d 1085 (La.1985). To establish a “satisfactory proof of loss” of an uninsured/underinsured motorist’s claim, the insured must establish that the insurer received sufficient facts which fully apprise the insurer that (1) the owner or operator of the other vehicle involved in the accident was uninsured or underin-sured; (2) that he was at fault; (3) that such fault gave rise to damages; and (4) establish the extent of those damages. Hart, supra. the four criteria have been met, the insurer cannot refuse the insured because the insured is unable to prove the exact extent of his general damages. McDill, supra. General damages by their very nature are subjective and incapable of exact computation. The amount that is due would be a figure over which reasonable minds could not differ. Id.
Coregis made three separate tenders before the start of trial. On February 11, 2004, an initial tender was made in the amount of $30,000, representing $25,000 in UM coverage and $5,000 in medical pay coverage. These two amounts represent what Coregis originally thought to be the UM coverage limits under its policy issued to WPSB. After the initial *668 litigation concerning the UM coverage, the determination of $1,000,000 in coverage was affirmed by this court, and on January 9, 2006, the Louisiana Supreme Court denied writs on the issue of coverage. Thereafter, on January 23, 2006, Coregis tendered an additional $85,000. This $85,000 was intended to supplement all prior insurance payments in order to compensate T.M.G. for expenses relating to past and future medicals for his broken femur, facial scarring, and spleen operation, and the general damage for pain and suffering resulting therefrom. At that time, Coregis tendered nothing for future loss of wages and the consequences of a long-term brain injury, maintaining that such damages were purely speculative.
On May 5, 2006, Coregis made its third and final tender after it hired Dr. Scott W. Soileau, a neurosurgeon, to review the findings of the irregular MRI. Upon his validation that the MRI did in fact indicate a possibility of a closed head injury with small contusions and diffuse axonal injury, Coregis |22tendered an additional $50,000. Jane Miller, Coregis’s adjuster assigned to the instant case, testified that this $50,000 represented the undisputed amount attributable solely to the brain injury.
Miller testified to the various measures taken to investigate and evaluate T.M.G.’s claim. Miller reviewed the accident report, medical records and expert reports supplied by plaintiff. In addition to reading these furnished expert reports, Core-gis hired its own experts, Drs. Ciota and Soileau, to examine T.M.G. and perform tests to aid in the evaluation of his condition.
Initially, concerning the timing of Core-gis’s payments, we agree with Coregis’s view that it had complied with the statute by tendering only the lower UM limits until such time that the higher $1,000,000 UM coverage was finally determined in the initial litigation in January 2006. The initial suit was based upon the understanding of both Coregis and WPSB concerning what was thought to have been the selection of UM coverage which was lower than the liability limits of the WPSB policy. The suit over coverage was not frivolous, and Coregis’s conduct was not arbitrary.
There is, of course, no issue that the amounts tendered by Coregis and Louisiana Farm Bureau were in excess of the approximately $100,000 in the stipulated special damages that accrued during the 4-1/2 years preceding the trial. Thus, the question presented concerns the reasonableness of the amount tendered in excess of the special damages which represented payments for primarily the general damages along with the largely prospective economic damages which may result from T.M.G.’s brain |2sinjury. In dollar amounts, the trial court awarded $500,000 in damages over the stipulated prior expenses, while Coregis and the other insurer had paid only $90,000 toward those damages.
The significant difference ($410,000) between the prior insurance payments and the trial court’s total award of unstipulated damages concerned the dispute over the continuing effect of T.M.G.’s brain injury. Coregis promptly obtained expert opinions in 2005[9] and 2006 and held to the view of its experts that the injury was not the primary cause of T.M.G.’s ADD and that with some additional therapy, counseling and medication, T.M.G. would not be seriously impaired throughout his work life. T.M.G.’s significant recovery in his school performance which began in early 2006 after the commencement of his special tutoring represents a specific fact upon *669 which Coregis could reasonably rely in making its defense. Most importantly, the trier-of-fact, in this case the trial court in its JNOV ruling, while rejecting Coregis’s defense regarding the consequences of the brain injury, obviously viewed that the defense was presented in good faith and was reasonable as opposed to arbitrary and capricious. Accordingly, giving manifest error deference to that ruling, we affirm the trial court’s ruling denying penalties against Coregis.
IV.

Costs

Coregis argues that the trial court abused its discretion by assessing it with all costs of the litigation given that plaintiff sought two avenues of | ^recovery and was successful with respect to only one. Although it concedes that the costs were properly taxed with respect to the damages claim, it argues that plaintiff should be assessed all costs related to the insurer bad faith claim.
La. C.C.P. art. 1920 provides:
Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause.
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.
The trial judge has great discretion in awarding costs, and his assessment of costs can be reversed by the appellate court only upon a showing of an abuse of discretion. In re Succession of Pitman, 42,654 (La.App.2d Cir.10/24/07), 968 So.2d 871; Barrilleaux v. Franklin Foundation Hosp., 96-0343 (La.App. 1st Cir.11/8/96), 683 So.2d 348, unit denied, 96-2885 (La.1/24/97), 686 So.2d 864; Joe Broadway, Inc., Wholesale Fish v. Dickson, 582 So.2d 967 (La.App. 2d Cir.1991).
The primary issue of this case being the assessment of damages and the plaintiff having prevailed, we find that the trial court did not abuse its discretion in assessing all costs of the litigation to Core-gis.

Conclusion

For the above reasons, the JNOV ruling of the trial court is affirmed. Costs of appeal are assessed to Coregis Insurance Company.
AFFIRMED.
BROWN, C.J., concurs with written reasons.

. Former La. R.S. 22:658 has been renumbered La. R.S. 22:1892 by Acts 2008, No. 415, § 1, eff. Jan. 1, 2009.

. The jury interrogatories listed $195,000 as the amount previously paid by the insurers, including Coregis. However, the actual payments appear to have totaled only $190,000.

. These damage awards are the result of an amended ruling which came after the request by both parties for clarification of the trial court's original judgment. The court originally awarded a total of $750,000 under Ínter-rogatory number 2, while awarding $600,000 under interrogatory number 1. The court, by amended ruling, lowered the award for loss of earning capacity from $300,000 to $150,000 and thereby awarded a total of $600,000.

. On August 14, 2003, T.M.G. underwent additional surgery in order to minimize facial scarring that resulted from the accident.

. The dictionary of occupational tides published by the United States Department of Labor lists 12,741 jobs. Plaintiff argues that *665 T.M.G. no longer has access to approximately 50% lo 60% of these jobs.

. Coregis's brief claims $ 195,000 in insurance payments and additionally asserts the $25,000 self-insured retention owed by WPSC.

. See La. R.S. 22:1973.

. Former La. R.S. 22:658 has been renumbered La. R.S. 22:1892 by Acts 2008, No. 415, § 1, eff. Jan. 1, 2009.

. Dr. Megan Ciota's testing of T.M.G. began in 2005.